The **ROMAN CATHOLIC ARCHDIOCESE OF NEW YORK**, et al., Plaintiffs,

v.

Kathleen **SEBELIUS**, in her official capacity as Secretary, United States Department of Health and Human Services, et al., Defendants.

**No. 12 Civ. 2542(BMC).**

United States District Court, E.D. New York.

Dec. 4, 2012.

Jones & Day, New York, NY, for Plaintiffs.

Benjamin Berwick, U.S. Department of Justice, Civil Division, Federal Programs, Neil Matthew Merkl, Kelley, Drye & Warren, LLP, Cecilia D. Noland–Heil, American Center for Law and Justice, for Defendants.

### MEMORANDUM DECISION AND ORDER

COGAN, District Judge.

The Patient Protection and Affordable Care Act (the "ACA"), Pub.L. No. 111–148, 124 Stat. 119 (2010), requires that group health insurance plans cover certain preventative medical services without cost-sharing, such as a copayment or a deductible. Pursuant to regulations subsequently issued, the preventative services that must be covered include contraception, sterilization, and related counseling (the "Coverage Mandate"), although certain religious employers are exempt from this requirement.

Plaintiffs are five New York-area Roman Catholic entities. Catholic doctrine teaches that contraception and sterilization, along with other forms of artificial interference with the creation of human life, are immoral and Catholic organizations may not condone or facilitate these practices. Plaintiffs allege that the Coverage Mandate violates their rights to religious liberty because it requires them to pay for contraceptive coverage despite

their sincerely-held religious beliefs. They assert claims under the Establishment, Free Exercise, and Free Speech clauses of the First Amendment, as well as the Religious Freedom Restoration Act and the Administrative Procedures Act. Plaintiffs ask the Court to invalidate and the enjoin enforcement of the Coverage Mandate against them.

Defendants have moved to dismiss plaintiffs' complaint for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that plaintiffs lack standing to challenge the Coverage Mandate and, alternatively, that the case is not ripe for judicial review.[1] For the reasons set forth below, defendants' motion is granted in part and denied in part.

### BACKGROUND

### I. The Relevant Statutes and Regulations

The Coverage Mandate is the result of a complex history of Congressional legislation and agency rulemaking involving the Department of Labor ("DoL"), the Department of the Treasury ("DoT"), and the Department of Health and Human Services ("HHS") (collectively, the "Departments").

In March 2010, Congress enacted the ACA as well as the Health Care and Education Reconciliation Act. These acts established a number of requirements relating to "group health plans," a term which encompasses employer plans that provide health care coverage to employees, regardless of whether the plans are insured or self-insured. *See* 42 U.S.C. § 300gg–91(a)(1); Interim Final Rules for Group Health Plans and Health Insurance Is-

suers Relating to Coverage of Preventative Services Under the Patient Protection and Affordable Care Act, 75 Fed.Reg. 41,726, 41,727 (July 19, 2010) ("Interim Final Rules"). As is relevant here, the ACA requires that group health plans provide coverage for a number of preventative medical services at no charge to the patient. § 300gg–13. Specially, the ACA provides that a group health plan must "at a minimum provide coverage for and shall not impose any cost sharing requirements for[,]" among other things, women's "preventative care and screenings ... as provided for in comprehensive guidelines supported by the Health Resources and Services Administration[.]" § 300gg–13(a)(4).[2]

The ACA's preventative services coverage requirement does not, however, apply to group health plans that are grandfathered. *See* 42 U.S.C. § 18011(a)(2). A group health plan is grandfathered when at least one person was enrolled in the plan on March 23, 2010 and the plan has continually covered at least one individual since that date. *See* 26 C.F.R. § 54.9815–1251T(a)(1)(i)(DoT); 29 C.F.R. § 2590.715–1251(a)(1)(i)(DoL); 45 C.F.R. § 147.140(a)(1)(i)(HHS). A plan may lose its grandfathered status, however, if, when compared to the terms of the plan as of March 23, 2010, it eliminates benefits, increases a percentage cost-sharing requirement, significantly increases a fixed-amount cost-sharing requirement, significantly decreases an employer's contribution rate, or imposes or lowers an annual limit on the dollar value of benefits. *See* 26 C.F.R. § 54.9815–1251T(g)(1)(DoT); 29 C.F.R. § 2590.715–1251(g)(1)(DoL); 45 C.F.R. § 147.140(g)(1)(HHS).

---

1. In addition to the parties' briefing on this motion, the Court has received an amicus brief filed by the American Center for Law & Justice and 79 members of the U.S. Congress in support of plaintiffs.

2. The Health Resources and Services Administration ("HRSA") is an agency within HHS.

The Departments began issuing regulations implementing the ACA in phases. On July 19, 2010, they announced that HHS was developing the HRSA guidelines and expected to issue them by August 1, 2011. *See* Interim Final Rules, 75 Fed.Reg. at 41,728. Since there were no existing HRSA guidelines concerning preventative care and screenings for women at the time of the Interim Final Rules, HHS commissioned the Institute of Medicine ("IOM"), a Congressionally-funded body, with "review[ing] what preventative services are necessary for women's health and well-being" and recommending comprehensive guidelines, as called for by the ACA. On July 19, 2011, IOM published a report recommending the inclusion of certain preventative medical services in HRSA's guidelines. Among other things, IOM recommended that group health plans be required to cover "the full range of Food and Drug Administration ["FDA"]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." FDA-approved contraceptive methods encompass oral conceptive pills, diaphragms, intrauterine devices, and emergency contraceptives, which, according to plaintiffs, can cause abortions.

HRSA adopted IOM's recommendations on August 1, 2011. Two days later, the Interim Final Rules were amended to "provide HRSA additional discretion to exempt certain religious employers from the [HRSA] Guidelines where contraceptive services are concerned." 76 Fed.Reg. 46,-263 (Aug. 3, 2011). *See also* 45 C.F.R. § 147.130(a)(1)(iv)(A). In order to qualify for the religious employer exemption, an organization must meet all of the following criteria:

(1) The inculcation of religious values is the purpose of the organization.

(2) The organization primarily employs persons who share the religious tents of the organization.

(3) The organization serves primarily persons who share the religious tenets of the organization.

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.[3]

45 C.F.R. § 147.130(a)(1)(iv)(B)(HHS). *See also* 29 C.F.R. § 2590.715–2713(a)(1)(iv)(DoL). HRSA exercised its discretion under the amended Interim Final Rules and exempted the religious employers who satisfy these criteria from the requirement of covering contraceptive services. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventative Services Under the Patient Protection and Affordable Care Act, 77 Fed.Reg. 8,725, 8,726 (Feb. 15, 2012).

The Departments received over 200,000 responses to their request for comments on the amended Interim Final Rules. Many of the comments were submitted by religiously-affiliated institutions and asserted that the religious employer exemption was too narrow and that the limited scope of the exemption raised religious liberty concerns. *Id.* at 8,727. On February 15, 2012, the Departments finalized the amended Interim Final Rules without making any changes to the criteria used to determine whether an organization qualified for the religious employer exemption. *Id.* These finalized amended rules are the operative regulations at issue in this suit and, together with the HRSA guidelines,

---

**3.** These sections of the Internal Revenue Code apply to "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "the exclusively religious activities of any religious order." 26 U.S.C. § 6033(a)(1), (a)(3)(A)(i), (a)(3)(A)(iii).

constitute the Coverage Mandate. *See* 29 C.F.R. § 2590.715–2713(a)(1)(iv)(DoL); 45 C.F.R. § 147.130(a)(1)(iv)(HHS).

At the same time that they finalized the Interim Final Rules, however, the Departments announced a "temporary enforcement safe harbor" period during which they planned "to develop and propose changes to these final regulations that would meet two goals—providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services[.]" 77 Fed.Reg. at 8,727. Without the safe harbor, non-grandfathered plans would be required to comply with the Coverage Mandate for plan years beginning on or after August 1, 2012. The safe harbor extended this date, by a year, to plan years beginning on or after August 1, 2013, during which time the Departments agreed not to take any enforcement action against an employer or group health plan that complies with the conditions of the safe harbor. *See* HHS, Guidance on Temporary Enforcement Safe Harbor, at 3 (Aug. 15, 2012), *available at* http://cciio.cms.gov/resources/files/prev–services–guidance–08152012.pdf (last visited Dec. 3, 2012). In order to comply with the terms of the safe harbor, the organization must (1) be organized and operate as a non-profit entity, (2) have "consistently not provided all or the same subset of contraceptive coverage otherwise required at any point" from February 10, 2012 onward because of the organization's religious beliefs, (3) provide notice to participants that some or all contraceptive services will not be covered for the first plan year beginning on or after August 1, 2012, and (4) provide a certification that it satisfies these criteria.

Consistent with their announced plan "to develop and propose changes" to the Interim Final Rules, on March 21, 2012, the Departments filed an advance notice of proposed rulemaking ("ANPRM") in the Federal Register concerning possible means of accommodating religious organizations' objections to the Coverage Mandate. *See* Certain Preventative Services under the Affordable Care Act, 77 Fed. Reg. 16,501 (Mar. 21, 2012). Specifically, the ANPRM "presents questions and ideas" and provides an "opportunity for any interested stakeholders to provide advice and input into the policy development relating to the accommodation to be made with respect to non-exempted, non-profit religious organizations with religious objections to contraceptive coverage." *Id.* at 16,503. One possible accommodation that the Departments "intend to propose" is to require health insurance issuers to provide health insurance coverage that excludes contraceptive services to objecting religious organizations while, at the same time, offering contraceptive coverage directly to plan participants without charging either the participants or the organization. *Id.* at 16,505. Although the Departments have stated an intent to finalize amended regulations so that they are effective prior to the end of the safe harbor, *id.* at 16,503, the Coverage Mandate is the currently-operative law and the ANPRM does not change that.

Indeed, failure to comply with the Coverage Mandate may result in substantial penalties. Under the Internal Revenue Code, large employers who fail to offer "full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan" can be assessed an annual fine of $2,000 per full-time employee. 26 U.S.C. § 4980H(a), (c)(1). An additional tax of $100 per employee per day may be imposed for "any failure of a group health plan" to provide required coverage. 26 U.S.C. § 4980D(b). *See also* 42 U.S.C. § 300gg–22(b)(2)(C)(i) (providing

for penalties of up to $100 per person per day for failures to satisfy coverage requirements).

## II. The Plaintiffs

The five plaintiffs are all entities affiliated with the Roman Catholic Church. In their complaint, they allege that the Coverage Mandate places them in a position where they are forced to either violate the tenets of their religious faith or pay substantial penalties for adhering to their beliefs. In particular, if plaintiffs want to avoid the penalties for non-compliance with the Coverage Mandate, they must either facilitate and subsidize activity, namely the provision of contraceptives, that their beliefs forbid or curtail their operations and ministries in a way that is also inconsistent with their faith.

### A. The Archdiocese

The Roman Catholic Archdiocese of New York (the "Archdiocese") is a non-profit organization that encompasses 370 parishes located in the New York area. It administers numerous charitable and educational programs, which, in line with Catholic teachings, are not aimed solely at Catholics, but are meant to benefit the broader community. The Archdiocese, its parishes, and its institutions employ nearly 10,000 people, almost 8,000 of whom are lay people. The Archdiocese does not know how many of its employees are Catholic.

The Archdiocese operates a self-insured health plan, underwriting its employees' medical costs. Its health plan and pharmaceutical coverage are administered by third parties. The plan year for the Archdiocese's plan begins on January 1. Consistent with Catholic teaching, the plan currently does not cover abortifacients, sterilization, or contraception.[4] Nearly 9,000 people, both Catholic and non-Catholic, are covered under the Archdiocese's health plan. The Archdiocese does not believe that its plan is eligible for grandfathered status under the ACA because the plan significantly increased the 10% employee contribution requirement and also increased co-payment requirements for higher-earning employees. Since the Archdiocese employs and serves a number of non-Catholics, the Archdiocese is uncertain of whether it will qualify for the current religious employer exemption from the Coverage Mandate. However, the Archdiocese claims to fall within the scope of the one-year safe harbor, meaning that, under the current regulations, the Coverage Mandate will become applicable to it for the plan year beginning January 1, 2014.

The Archdiocese argues that once the Coverage Mandate goes into effect, it will either have to provide coverage for services in violation of its sincerely-held religious beliefs or it will be exposed to significant fines for either discontinuing health coverage for its employees or continuing to provide coverage without the objectionable services. The Archdiocese claims that it is currently being injured, even before the Coverage Mandate goes into effect, because it needs to (1) begin budgeting for plan changes that will need to occur because of the Coverage Mandate, (2) communicate with plan participants and third-party vendors about any plan changes, and (3) update its plan documents. While making even small changes to its plan requires the Archdiocese to begin preparing at least six months in advance, the Archdiocese claims that preparing for the Coverage Mandate requires additional lead time because it forces the Archdiocese to "decide between breaking the law and

---

4. Although contraceptives are barred under the Archdiocese's plan, the medication may be covered when provided for medically necessary, non-contraceptive purposes.

making significant, likely revolutionary, changes to its employee coverage."

Further, failing to comply with the Coverage Mandate could cause the Archdiocese to incur penalties of up to $200 million per year. As a result, the Archdiocese has already begun budgeting and preparing for the Coverage Mandate. It has expended resources to comply with the safe harbor as well as to review the Coverage Mandate, the religious employer exemption, and the likely impact on the Archdiocese. The ANPRM does not alleviate this situation because, even if the current Coverage Mandate is eventually changed, it will not provide the Archdiocese with enough time to implement changes to its plan. With regard to its ability to satisfy the current religious employer exemption, the Archdiocese claims that it will either have to curtail employing and providing services to non-Catholics, in violation of its beliefs, or undertake an onerous investigation of the religious beliefs of those whom it employs and serves.

### B. *ArchCare*

Catholic Health Care System and its affiliates, the Continuing Care Community of the Archdiocese of New York (collectively, "ArchCare"), are non-profit organizations that provide faith-based health care to the poor and disadvantaged, including elderly and disabled individuals, consistent with Catholic values. ArchCare operates a self-insured health plan for its employees, underwriting the plan while contracting with third parties for administration of the plan. The plan covers approximately 2,500 people and ArchCare does not know how many those covered are Catholic. Like the Archdiocese's plan, ArchCare's plan does not cover abortifacients, sterilization, or contraception in accordance with Catholic moral teaching. ArchCare claims that it does not qualify for the religious employer exemption and that, because it recently increased employ-

ee cost-sharing requirements by more than 5%, its plan is not grandfathered. But since it claims to fall within the safe harbor, the Coverage Mandate will become applicable to ArchCare for the plan year beginning January 1, 2014.

ArchCare's explanation of how it is currently being injured by the Coverage Mandate parallels that of the Archdiocese. ArchCare claims that it is already budgeting for fines of up to $40 million per year and otherwise preparing for possible changes to its plan. Additionally, ArchCare claims that the "specter of significant fines" has forced ArchCare to divert funds that it would otherwise use to expand its healthcare operations.

### C. *The Diocese and Catholic Charities*

The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese") is a nonprofit organization that encompasses 134 parishes in Nassau and Suffolk counties. The Diocese is responsible for numerous charitable and educational programs for the benefit of Catholics and non-Catholics alike. One such program is Catholic Charities of the Diocese of Rockville Centre ("Catholic Charities"), an organization that provides a variety of social services to both Catholics and non-Catholics. Together with its hospitals, schools, parishes and other associated institutions, the Diocese employs nearly 20,000 people (of which over 600 are employed by Catholic Charities). Neither the Diocese nor Catholic Charities know how many of these employees are not Catholic.

Employees of both the Diocese and Catholic Charities receive health care coverage through the Diocese's health plan, which covers over 3,000 people. The Diocese operates a self-insured health plan, administered by third parties, underwriting its employees' medical costs. The plan does not cover abortifacients, sterilization,

or contraception. The Diocese claims that its plan will not be grandfathered under the ACA due to recently increased cost-sharing requirements. Catholic Charities claims that it does not qualify for the religious employer exemption to the Coverage Mandate, while the Diocese is uncertain as to whether it will qualify for the exemption. But both the Diocese and Catholic Charities argue that they fall within the scope of the safe harbor, meaning that the Coverage Mandate will apply to them for the plan year beginning January 1, 2014.

The Diocese and Catholic Charities assert current injuries resulting from the Coverage Mandate that are similar to those claimed by the Archdiocese and ArchCare except that the Diocese claims it requires at least nine months of lead time to make changes to its health plan. Further, the Diocese claims that it faces up to $67 million in penalties a year for failure to comply with the Coverage Mandate, while Catholic Charities' exposure is over $9 million a year. Since both the Diocese and Catholic Charities operate according to "break-even budgets," the possibility of fines require these plaintiffs to set aside funds which, consequently, cannot be used to fund other initiatives or services. Indeed, these initiatives and existing services may need to be cut.

### D. CHSLI

Catholic Health Services of Long Island ("CHSLI") is a non-profit organization that oversees Catholic health care organizations within the Diocese, including six hospitals, three nursing homes, and a hospice service. Neither CHSLI nor its member institutions condition employment or receipt of medical services on being Catholic.

CHSLI operates a self-insured health plan for its employees and employees of its member institutions, underwriting the plan while contracting with third parties for administration of the plan. The plan covers approximately 25,000 people. Consistent with Catholic teaching, CHSLI's plan does not cover abortifacients, sterilization, or contraception. Because CHSLI made certain plan design changes, including increasing certain copayment requirements beyond allowable limits, its plan does not enjoy grandfathered status. Although they are non-profit organizations, CHSLI and its member institutions are not covered by the relevant Internal Revenue Code provisions so as to be eligible for the religious employer exception. But because CHSLI claims to fall within the scope of the safe harbor, the Coverage Mandate will apply to it for the plan year beginning January 1, 2014.

Like the other plaintiffs, CHSLI points to current harms relating to its preparations for possibly changing its plan, budgeting for possible fines, and diverting funds from capital plans. CHSLI claims to require a full year of lead time to make changes to its health plan and that it could face up to $400 million per year in possible exposure to fines. CHSLI argues that these fines would imperil its ability to continue to operate and that it cannot, pursuant to its legal obligations as a health care provider, restrict its services to Catholics so as to fall within the religious employer exemption.

Moreover, CHSLI claims to face unique harms because of its dealings with employee unions, specifically the New York State Nurses Association ("NYSNA"). CHSLI negotiated with NYSNA so that the nurses at one CHSLI institution, St. Joseph Hospital, would receive health coverage through the NYSNA plan and so that the coverage they received through the NYSNA plan would be consistent with Catholic teachings on abortion, contraception, and sterilization. Each pay period, CHSLI

transfers funds to the NYSNA plan to provide benefits for these nurses. NYSNA informed CHSLI that, because of the Coverage Mandate, it can no longer administer its plan in a manner that is consistent with Catholic teachings. CHSLI is evaluating whether to bring the nurses under CHSLI's self-insured plan. Doing so will likely increase the costs of CHSLI's health care costs and may require CHSLI to pay concessions to NYSNA. Further, CHSLI was considering moving nurses at another hospital from its own self-insured plan to the NYSNA plan because doing so would save CHSLI approximately $1 million. But because NYSNA must comply with the Coverage Mandate, CHSLI has abandoned its plan to transition coverage and must forgo the cost savings. CHSLI suspects that other unions will take similar positions.

### DISCUSSION

The gravamen of defendants' motion to dismiss is that this Court lacks the authority to adjudicate plaintiffs' claims for two reasons: first, plaintiffs do not have standing to assert their claims because the Coverage Mandate is not causing plaintiffs an imminent injury; and, second, plaintiffs' case is not ripe because of the proposed changes to the Coverage Mandate. In considering defendants' motion, the Court is not writing on a blank slate. Lawsuits challenging the Coverage Mandate have been brought in numerous district courts and six courts have already explicitly addressed the jurisdictional arguments that defendants advance here.

First, in *Nebraska v. Dep't of Health & Human Servs.*, 877 F.Supp.2d 777 (D.Neb. July 17, 2012), a group of states, Catholic institutions, and individuals brought suit challenging the Coverage Mandate. With regard to the institutional and individual

plaintiffs, the court found that those plaintiffs did not adequately allege that their health plans were not grandfathered and, thus, failed to plead that they were subject to the Coverage Mandate. As a result, the court concluded that they lacked standing. *Id.* at 791–95.[5] Although the *Nebraska* court did not need to reach the issue, it also concluded that even if plaintiffs had standing, their claims were not ripe because the Departments were still "modify[ing] their positions" and plaintiffs did not face imminent or inevitable hardship "in light of the temporary enforcement safe harbor and the ANPRM." *Id.* at 801–03.

In *Belmont Abbey Coll. v. Sebelius*, 878 F.Supp.2d 25 (D.D.C.2012), defendants sought to dismiss a challenge to the Coverage Mandate brought by a Catholic college on standing and ripeness grounds. Unlike in *Nebraska*, plaintiff in *Belmont Abbey* had sufficiently alleged that its health plan was ineligible for grandfathered status. *Id.* at 34–35. Additionally, the *Belmont Abbey* court concluded that the temporary enforcement safe harbor did not render plaintiff's injury "too remote" to destroy standing. *Id.* at 36–37. The court nonetheless held that plaintiff lacked standing, reasoning that "[b]ecause an amendment to the final rule that may vitiate the threatened injury is not only promised but underway, the injuries alleged by plaintiff are certainly not impending." *Id.* at 37 (internal quotation marks omitted). Additionally, the court ruled that the case was not ripe in part because defendants' position was "not sufficiently final to render the regulation 'fit' for judicial review." *Id.* at 39–40.

In *Wheaton Coll. v. Sebelius*, 887 F.Supp.2d 102 (D.D.C.2012), the court similarly dismissed a Catholic college's claims

---

**5.** The *Nebraska* court also dismissed the states' claims on constitutional and prudential standing grounds, but these holdings are not pertinent to the instant motion.

for lack of standing and lack of ripeness, reasoning that the application of the Coverage Mandate to plaintiff remained "hypothetical." *Id.* at 113–14. Likewise in *Legatus v. Sebelius*, 901 F.Supp.2d 980, 2012 WL 5359630 (E.D.Mich. Oct. 31, 2012), the court followed *Belmont Abbey* and *Wheaton Coll.* and denied a Catholic non-profit organization's request for a preliminary injunction, reasoning that the organization lacked standing to challenge because its injury was "conjectural." *Id.* at 989–90, at *5. However, the *Legatus* court granted a preliminary injunction in favor of two other plaintiffs, an individual Catholic business owner and his business, who were not eligible for the temporary enforcement safe harbor. *Id.* at 999, at *15.[6]

In *Catholic Diocese of Nashville v. Sebelius*, No. 12–cv–0934, 2012 WL 5879796 (M.D.Tenn. Nov. 21, 2012), the court also followed *Nebraska, Belmont Abbey,* and *Wheaton Coll.* in dismissing plaintiffs' claims. The *Nashville* court "expressly" found that "the preventative services regulations, in their current form, will not be enforced against Plaintiffs." *Id.* at *3. Further, the court echoed *Belmont Abbey* in concluding that, because of the ANPRM, "the injuries alleged by Plaintiffs are not 'certainly impending.'" *Id.* at *4. Although it did not need to reach the issue, the *Nashville* court also concluded that plaintiffs' claims were not ripe. *Id.* at *5. Finally, in *Zubik v. Sebelius*, 911 F.Supp.2d 314, 317–18, No. 12–cv–676, 2012 WL 5932977, at *1 (W.D.Pa. Nov. 27, 2012), the court also followed *Belmont Abbey* and held that in light of the Depart-

ments' "commitment not to enforce the challenged regulations against Plaintiffs while accommodations are under consideration, and in any event no sooner than January 2014, Plaintiffs' claims are not ripe for judicial review and that Plaintiffs have not alleged an injury in fact under existing law sufficient to establish standing."

## I. The 12(b)(1) Standard

"The burden of demonstrating subject matter-jurisdiction lies with the party asserting it." *MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 141 (2d Cir.2011) (quoting *Mathirampuzha v. Potter*, 548 F.3d 70, 85 (2d Cir.2008)). "In a motion to dismiss pursuant to [Rule] 12(b)(1), the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001). As the court noted in *Doyle v. Midland Credit Mgmt.*, No. 11–cv–5571, 2012 WL 5210596, at *1 (E.D.N.Y. Oct. 23, 2012), "[w]hen evaluating a motion to dismiss under Rule 12(b)(1), the court must distinguish between two types of challenges." On one hand, facial challenges contest "the sufficiency of the jurisdictional facts alleged, not the facts themselves." *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 887 n. 15 (2d Cir.1996). On the other hand, factual challenges "dispute[ ] the accuracy of the facts alleged in the complaint or otherwise suggest that the district court in fact lacks subject matter jurisdiction." *Doyle*, 2012 WL 5210596, at *1 (citing *Robinson*, 269 F.3d

---

6. Indeed, two other courts have granted preliminary injunctions in favor of plaintiffs who are not eligible for the temporary enforcement safe harbor and, consequently, must comply with the Coverage Mandate for plan years beginning on or after August 1, 2012. *Tyndale House Publishers, Inc. v. Sebelius*, 904 F.Supp.2d 106, 2012 WL 5817323 (D.D.C.

Nov. 16, 2012); *Newland v. Sebelius*, 881 F.Supp.2d 1287 (D.Colo.2012). *But see O'Brien v. Dep't of Health and Human Servs.*, 894 F.Supp.2d 1149, 2012 WL 4481208 (E.D.Mo. Sept. 28, 2012) (dismissing a secular, for-profit company's claims for declaratory and injunctive relief).

at 140). *See also Guadagno v. Wallack Ader Levithan Assocs.*, 932 F.Supp. 94, 95 (S.D.N.Y.1996) (contrasting a facial challenge, which is "based on the pleadings," with a factual challenge, which is "based on extrinsic evidence.").

When deciding a facial challenge to jurisdiction, the court "accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir.2010) (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir.2008)).[7] But, in a factual challenge, "where evidence relevant to the jurisdictional question is before the court, the district court ... may refer to [that] evidence." *Robinson*, 269 F.3d at 140 (alterations in original, internal quotation marks omitted). *See also Engel v. Scully & Scully, Inc.*, 279 F.R.D. 117, 123 (S.D.N.Y.2011) ("When deciding a motion to dismiss pursuant to Rule 12(b)(1) ... a district court 'may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits.' ") (quoting *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n. 4 (2d Cir. 2007)).

When deciding a factual challenge to subject matter jurisdiction, "the burden is on the plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts."

*Guadagno*, 932 F.Supp. at 95. *See also In re Rhodia S.A. Sec. Litig.*, 531 F.Supp.2d 527, 537 (S.D.N.Y.2007) ("the burden of proving jurisdiction is on the party asserting it ... to make a prima facie showing of jurisdiction.") (quoting *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994)). Whereas a court's task on a facial challenge is to assess the adequacy of a plaintiff's allegations of jurisdiction, factual challenges require a court to assess the adequacy of a plaintiff's showing of jurisdiction and "that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *See Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998).

Here, defendants argue that because they "challenge jurisdiction on the face of the Complaint, the Complaint must plead sufficient facts to establish that jurisdiction exists." In other words, defendants purport to bring a facial challenge to plaintiffs' claims. In response to defendants' motion, plaintiffs supply several affidavits that support and amplify the factual allegations in the complaint on which plaintiffs' base their claim of subject matter jurisdiction. In light of this extrinsic evidence, the Court has conducted a factual analysis of the sufficiency of plaintiffs' showing of subject matter jurisdiction. Therefore, even though some of the arguments advanced by the parties, as described below, speak

---

**7.** There is some inconsistency in the authorities concerning whether, on a facial challenge to subject matter jurisdiction, the court should construe the allegations in the complaint in a plaintiff's favor. Contrary to *Carver*, another line of cases in the Second Circuit provides that, in deciding a motion for lack of subject matter jurisdiction, courts "are not to draw inferences from the complaint favorable to plaintiffs." *See J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004). *See In re Park Ave. Radiologists, P.C.*, 450 B.R. 461, 467 n. 6 (Bankr.S.D.N.Y.2011) (observing the conflicting lines of Second Circuit cases). Because *Carver* addresses a stand-

ing-based challenge to subject matter jurisdiction, the issue at the core of this motion, and there is precedent specific to standing that allows "each element ... [to] be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation[,]" *Carver*, 621 F.3d at 225 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)), the Court follows *Carver*. This distinction is ultimately not material for this motion, though, because the Court engages in a factual inquiry, rather than a facial one.

in terms of plaintiffs' allegations, the Court has considered entire factual record before it, which is largely undisputed.

## II. Standing

The issue at the heart of defendants' motion is whether plaintiffs have standing under Article III of the Constitution. "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of [Article III]. This is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claims." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).

■ As it is an element of the federal courts' subject matter jurisdiction, plaintiffs bear the burden of establishing standing. *See Johnson v. Bryson*, 851 F.Supp.2d 688, 699 (S.D.N.Y.2012). "To meet the Article III standing requirement, a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir.2006) (quoting *Lujan*, 504 U.S. at 560–61, 112 S.Ct. at 2136). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Connecticut v. Physicians Health Servs. of Conn. Inc.*, 287 F.3d 110, 116 (2d Cir.2002) (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136). "A threatened injury must be 'certainly impending' to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 1724–25, 109 L.Ed.2d 135 (1990).

■ The Second Circuit has commented that "[i]njury in fact is a low threshold, which we have held need not be capable of sustaining a valid cause of action, but may simply be the fear or anxiety of future harm." *Ross v. Bank of America, N.A.*, 524 F.3d 217, 222 (2d Cir.2008) (internal quotation marks omitted). Injury in fact may be based on economic or non-economic interests. A plaintiff "may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause and the Free Exercise Clause." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). "A plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has 'an actual and well-founded fear that the law will be enforced against' it." *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir.2000) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988)).

The parties do not dispute that a favorable judicial decision would redress plaintiffs' injuries. Rather, defendants seek to dismiss the complaint based on plaintiffs' supposed failure to demonstrate that the Coverage Mandate will cause them actual or imminent injuries in fact and that any such injuries are fairly traceable to defendants' actions. Defendants advance three principal challenges to plaintiffs' ability to demonstrate standing: First, defendants argue that the Coverage Mandate, as applied to plaintiffs, will not cause any change in practices and, therefore, cannot cause injury, because certain plaintiffs'

plans are grandfathered and other plaintiffs' plans already cover contraceptives. Second, defendants claim that any harm that plaintiffs may incur is too distant temporally to constitute an imminent injury. Third, defendants argue that, as a result of the ANPRM, plaintiffs' injury is only speculative and, thus, not certainly impending.

### A. The Coverage Mandate and Plaintiffs' Practices

#### 1. Grandfathered Status

At the outset, defendants argue that three plaintiffs (Diocese, Catholic Charities, and ArchCare) fail to "allege with sufficient particularity" in the complaint "that their health plans are not grandfathered." Since the Coverage Mandate does not apply to grandfathered plans, *see* 42 U.S.C. § 18011(a)(2), defendants contend that Diocese, Catholic Charities, and ArchCare cannot suffer an injury in fact fairly traceable to the Coverage Mandate if they are exempt from its requirements and do not need to change their current coverage. Defendants contrast the "threadbare allegations" put forth by the Diocese, Catholic Charities, and ArchCare with the Archdiocese's and CHSLI's allegations concerning grandfathering, which provide that these plaintiffs' plans are not grandfathered because of increases in employee contribution and copayment requirements.

■ Since, however, on a motion to dismiss for lack of standing, the Court need not confine its inquiry to the allegations in the complaint, *see Engel*, 279 F.R.D. at 123, the Court also looks to the affidavits submitted by plaintiffs in support of their briefing on this motion, which provide additional information on their plans. ArchCare represents that its plan is not eligible for grandfathered status because "the employee cost share increased by more than 5% effective January 1, 2012." The Dio-

cese and Catholic Charities (which share the same plan) represent that they made "plan design changes," including an increase in "cost sharing for employees ... which caused the Plan to lose its grandfathered status in 2011." Defendants argue that these affidavit statements are still insufficient to establish standing because an increase in cost-sharing does not necessarily prevent a plan from maintaining grandfathered status under 45 C.F.R. § 147.140(g).

■ Defendants' argument notwithstanding, an increase in a *percentage* cost-sharing requirement does cause a plan to cease being grandfathered under § 147.140(g)(ii). Since ArchCare enacted a 5% increase in its employees' share, it has sufficiently demonstrated that its plan is not grandfathered.

■ The Diocese and Catholic Charities present a closer question. The law is clear that "a 'naked assertion' that a plan does not satisfy the legal definition of 'grandfathered health plans' is not sufficient" to establish standing. *Nebraska*, 877 F.Supp.2d at 791. Therefore, the Court does not credit the conclusory assertion that the Diocese's and Catholic Charities' plan is not grandfathered. The only facts that the Diocese and Catholic Charities provide to support their contention is that the plan made a change to an unspecified employee cost-sharing requirement. But defendants are correct that all cost-sharing increases do not cause a plan to lose grandfathered status under § 147.140(g). Based on the unadorned reference to a cost-sharing increase, the Court simply cannot determine whether the relevant plan is eligible or ineligible for grandfathered status. Therefore, the Court concludes that the Diocese and Catholic Charities have failed to satisfy their burden of establishing that the Coverage Mandate

applies to them and their claims are dismissed for lack of standing.[8]

## 2. Plaintiffs' Existing Contraceptive Coverage

Defendants also note that two plaintiffs (Archdiocese and ArchCare) fail to state in the complaint whether their current health plans cover contraceptive services and contend that the Coverage Mandate cannot cause these plaintiffs an injury in fact if the Archdiocese and ArchCare already cover contraceptive services. Plaintiffs' affidavits, however, clarify that neither the Archdiocese nor ArchCare provide contraceptive coverage to the extent required by the Coverage Mandate. The Archdiocese explains that its "employee health plan complies with Catholic teachings on abortifacients, sterilization, and contraception" and that "abortion and sterilization are not covered." Further, "[c]ontraceptives are also barred under the plan, but may be available for medically necessary, non-contraceptive purposes" subject to a three-step appeal process. ArchCare's plan similarly does not cover abortion or sterilization and only covers contraceptives for certain medically-necessary, non-contraceptive purposes subject to an approval procedure. Defendants' argument is, therefore, unavailing.

## B. The Enforcement Safe Harbor and Imminent Injury

Defendants next argue that those plaintiffs whose plans are ineligible for grandfathered status have not demonstrated an imminent injury because, in light of the temporary enforcement safe harbor, they are protected from any enforcement actions for failure to comply with the Coverage Mandate until January 1, 2014. According to defendants, this delay before any enforcement actions could be brought renders any injury to plaintiffs too temporally distant to be considered imminent. In support, defendants cite *McConnell v. FEC*, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003). In *McConnell*, a Senator brought suit to challenge a statute regulating campaign advertisements. Since the statute could not have affected the Senator's actions until five years into the future, the Supreme Court concluded that the "alleged injury in fact is too remote temporally to satisfy Article III standing." *Id.* at 226, 124 S.Ct. at 708.

Defendants' reliance on *McConnell* is unavailing. Despite the Supreme Court's language, it was not simply the temporal distance between the lawsuit and the future injury that made the injury insufficiently imminent to support standing. Rather, in *McConnell*, the court "could not know whether the plaintiffs would even suffer an injury six years later." *Thomas More Law Ctr. v. Obama*, 651 F.3d 529, 538 (6th Cir.2011), *abrogated on other grounds, Nat'l Fed'n of Indep. Bus. v. Sebelius*, ── U.S. ──, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). As the Sixth Circuit explained, "[t]he challenged provision

---

**8.** Since the Diocese and Catholic Charities have not established that the Coverage Mandate applies to them at all, they have also failed to demonstrate that they will face any of the harms that arise from the operation of the Coverage Mandate, whether conducting an intrusive inquiry to determine if they fall within the scope of the religious employer exemption or incurring costs to prepare for the Coverage Mandate going into effect. They could, conceivably, argue that they are nonetheless harmed because they cannot make certain changes to their current plan without jeopardizing their grandfathered status. Indeed plaintiffs in other actions have made such an argument. *See Nebraska*, 877 F.Supp.2d at 791–93. The Diocese and Catholic Charities have not, however, advanced this theory, maintaining instead that they are ineligible for grandfathering. And, in any event, the Diocese and Catholic Charities have not provided sufficient facts to demonstrate that they will suffer a concrete harm even if their plan is considered grandfathered.

would affect the *McConnell* plaintiffs only if the following things happened in an election six years later: (1) a challenger ran in the primary or election; (2) the plaintiff created an advertisement mentioning the challenger; (3) the advertisement did not identify the plaintiff by name; and (4) the broadcasters attempted to charge McConnell more than their lowest unit rate for his ads." *Id.* Indeed, when determining whether an injury is sufficiently imminent for Article III standing purposes, courts focus "on the probability of harm, not its temporal proximity." *520 S. Mich. Ave. Assocs., Ltd. v. Devine,* 433 F.3d 961, 962 (7th Cir.2006). *See also Connecticut v. Am. Elec. Power Co., Inc.,* 582 F.3d 309, 343 (2d Cir.2009) ("In describing imminence, the [*Lujan*] Court was not imposing a strict temporal requirement that a future injury occur within a particular time period following the filing of the complaint. Instead, the Court focused on the *certainty* of that injury occurring in the future, seeking to ensure that the injury was not too speculative.").

■ Here, the temporary enforcement safe harbor does nothing to reduce the certainty that plaintiffs will suffer injury from the Coverage Mandate in the future. All the safe harbor does is postpone the date by which plaintiffs must comply with the Coverage Mandate or suffer penalties. That deadline is looming and certain. *See Reg'l Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974) ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect.") For these reasons, the *Belmont Abbey* court concluded that "the temporary-enforcement safe harbor does not render the alleged injury too remote to constitute an injury[.]" 878 F.Supp.2d at 36. This Court agrees.

Further, the delay until the Coverage Mandate will be enforced against plaintiffs—just over a year—is short when compared to other cases where standing was established. Several courts have found that found that injuries occurring three, six, or even thirteen years in the future can be sufficiently imminent for standing purposes. *See Thomas More Law Ctr.,* 651 F.3d at 537 (collecting cases). Indeed, when the minimum coverage provision of the ACA (the "Individual Mandate") was being challenged in the courts, the government—including many of the same defendants in this action—conceded that an injury that would not occur for over two years was sufficient for standing. *Florida ex rel. Attorney Gen. v. Dep't of Health and Human Servs.,* 648 F.3d 1235, 1243 (11th Cir.2011), *reversed on other grounds, Nat'l Fed'n of Indep. Bus. v. Sebelius,* —— U.S. ——, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). Therefore, the Court concludes that the temporary enforcement safe harbor does not prevent plaintiffs from establishing imminent injuries for standing purposes.

C. *The ANPRM and Certainly Impending Injury*

■ Defendants' central argument is that plaintiffs' injuries are not certainly impending because, through the ANPRM, the Departments will change the requirements of the Coverage Mandate before the end of the temporary enforcement safe harbor in order to accommodate the interests of religious organizations like plaintiffs. In this sense, defendants contend that plaintiffs' injuries are not imminent because it is unlikely that they will come to pass. Further, since the "underlying purpose of the imminence requirement is to ensure that the court ... does not render an advisory opinion in a case in which no injury would have occurred at all[,]" *Animal Legal Defense Fund, Inc. v. Espy,* 23

F.3d 496, 500 (D.C.Cir.1994) (internal quotation marks omitted), the prospect that the ANPRM will prevent any injury from befalling plaintiffs undermines their standing.

On the other hand, plaintiffs characterize the ANPRM as merely stating the Departments' intention to change the Coverage Mandate. Because the Coverage Mandate remains in effect notwithstanding the ANPRM, plaintiffs still face future injuries stemming from their forced choice between incurring fines or acting in violation of their religious beliefs. Additionally, plaintiffs explain that having to prepare for fines or changes to their employee health coverage is presently causing them to incur costs, divert resources, and forgo savings.

Courts have been receptive to defendants' argument, although they sometimes address it in the context of ripeness rather than standing. The *Belmont Abbey* court agreed with the Departments that any injury was "too speculative to confer standing given the government's clear intention to amend the regulation before the safe harbor lapses." 878 F.Supp.2d at 36. *See also Zubik*, 911 F.Supp.2d at 328, 2012 WL 5932977, at *11 ("the Court must agree with Defendants that any injury from enforcement of the preventative care regulations after the safe harbor expires is purely speculative, as Defendants have formally declared their intention to amend the preventative care regulations before that time in order to accommodate the concerns of religious organizations"); *Nashville*, 2012 WL 5879796, at *3 ("the Court expressly finds . . . that the preventive services regulations, in their current form, will not be enforced against Plaintiffs"); *Legatus*, 901 F.Supp.2d at 989, 2012 WL 5359630, at *5 (agreeing with other cases that because of the temporary enforcement safe harbor and the ANPRM, plaintiff's "injury is conjectural"); *Whea-*

*ton Coll.*, 887 F.Supp.2d at 113 (noting that "the regulations Wheaton challenges are being amended precisely in order to accommodate Wheaton's concerns"); *Nebraska*, 877 F.Supp.2d at 802 ("this forced choice is neither imminent nor inevitable in light of the temporary enforcement safe harbor and the ANPRM").

Defendants do not dispute that plaintiffs are presently incurring costs in connection with their preparation for the Coverage Mandate going into effect. Instead, defendants argue that because the ANPRM means that the plaintiffs are unlikely to face injury from the Coverage Mandate in the future, plaintiffs should not be able to "transform the speculative possibility of future injury into a concrete current injury for standing purposes by asserting that they have to plan now for their future needs." Courts have also been receptive to this argument. *Belmont Abbey*, 878 F.Supp.2d at 41 ("Costs stemming from Plaintiff's desire to prepare for contingencies are not sufficient, however, to constitute hardship . . . particularly when the agency's promises and actions suggest the situation Plaintiff fears may not occur."); *Zubik*, 911 F.Supp.2d at 329, 2012 WL 5932977, at *11 (same); *Wheaton Coll.*, 887 F.Supp.2d at 112–13 (same). *See also Nebraska*, 877 F.Supp.2d at 802 ("plaintiffs' desire to plan for future contingencies that may never arise does not constitute the sort of hardship that can establish the ripeness of their claims"); *Nashville*, 2012 WL 5879796, at *5 (same).

The key issue, therefore, is whether, despite the fact that plaintiffs are facing current and future harms in connection with the Coverage Mandate, constitutional standing is lacking because defendants have committed to amending the Coverage Mandate through the ANPRM. Indeed, the applicability of the ANPRM explains the split in the cases addressing the Cov-

erage Mandate that have been decided thus far. Courts have issued preliminary injunctions in favor of for-profit plaintiffs challenging the Coverage Mandate because the ANPRM and the temporary enforcement safe harbor were not at issue. *See Tyndale House Publishers,* 904 F.Supp.2d 106, 2012 WL 5817323; *Legatus,* 901 F.Supp.2d at 999, 2012 WL 5359630, at *15; *Newland,* 881 F.Supp.2d 1287. But where the ANPRM was applicable, courts have found standing to be lacking. *See Zubik,* 911 F.Supp.2d 314, 2012 WL 5932977; *Nashville,* 2012 WL 5879796; *Legatus,* 901 F.Supp.2d at 989–90, 2012 WL 5359630, at *5; *Wheaton Coll.,* 887 F.Supp.2d 102; *Belmont Abbey,* 878 F.Supp.2d 25.

In addressing the significance of the ANPRM, the Court must navigate between two competing considerations. On one hand, an agency should not be allowed to burden regulated entities with prospective regulation but be able to avoid judicial review of the regulation simply by representing that its view has not finalized and that the regulation may be amended. *See Am. Bird Conservancy, Inc. v. FCC,* 516 F.3d 1027, 1031 n. 1 (D.C.Cir.2008) ("[A]gencies cannot avoid judicial review of their final actions merely because they have opened another docket that may address some related matters."). On the other hand, a plaintiff should not be able to manufacture standing by merely asserting a need to prepare for uncertain future harms because, as defendants argue, "[s]uch reasoning would gut [the] standing doctrine." With these concerns in mind, the Court turns to the operation of the ANPRM and the specific harms to plaintiffs.

The Court will assume that the Departments issued the ANPRM in good faith and not as litigation posturing. *See Sossamon v. Texas,* 560 F.3d 316, 325 (5th Cir. 2009) ("Without evidence to the contrary, we assume that formally announced changes to official government policy are not mere litigation posturing."). But the ANPRM is not a "formally announced change[ ] to official government policy." Despite defendants' attempt to characterize the ANPRM as a binding promise not to enforce the Coverage Mandate, the fact is that the ANPRM does not prevent the Coverage Mandate, as it currently exists, from going into effect. It is not a change in policy; it merely seeks input to allow the Departments to consider possible revisions to the Coverage Mandate. The Departments need not make any changes to the Coverage Mandate to accommodate religious groups at all.[9]

In this light, the Court finds that plaintiffs' claimed future injuries are certainly impending. The law as it currently written requires that, beginning January 1, 2014, plaintiffs must either pay onerous fines or provide contraceptive coverage in violation of their beliefs. The Departments may alter the Coverage Mandate before that time, but the possibility of a change in the law does not mean that a requirement that will become effective by operation of law is not certainly impending. *Cf. Albertson v. Subversive Activities Control Bd.,* 382 U.S. 70, 77, 86 S.Ct. 194, 198, 15 L.Ed.2d 165 (1965) ("the mere contingency that the Attorney General might revise the regulations at some future time does not render premature [a] challenge to the existing requirements").

---

**9.** Plaintiffs contend that any possible accommodation that the Departments provide pursuant to the ANPRM will be inadequate. The Court agrees with defendants and rejects this argument as speculative since it is uncertain what form the accommodation, if any, will take. *See Wheaton Coll.,* 887 F.Supp.2d at 113 ("Wheaton only tilts at windmills when it protests that it will not be satisfied with whatever amendments defendants ultimately make.").

Thus, plaintiffs' future injuries are sufficiently imminent to constitute injuries in fact. Further, as long as an "agency's act creates a substantial probability of an injury in fact, the causation requirement of Article III is satisfied." *Mount Wilson FM Broadcasters, Inc. v. FCC,* 884 F.2d 1462, 1465 (D.C.Cir.1989) (internal quotation marks omitted). By issuing the Coverage Mandate, the Departments have created a substantial possibility of enforcement and, for the reasons discussed, the ANPRM does nothing to eliminate it. Therefore, the Court concludes that, notwithstanding the ANPRM, plaintiffs have standing to bring this suit based on their future injuries.

Despite defendants' numerous assertions that the Coverage Mandate will not be enforced, plaintiffs remain prospectively subject to the Coverage Mandate notwithstanding the ANPRM, and, thus, plaintiffs have articulated "an actual and well-founded fear" that the law will be enforced against them. *See Am. Booksellers Ass'n,* 484 U.S. at 393, 108 S.Ct. at 643. The possibility of a future amendment to the Coverage Mandate that relieves plaintiffs from their obligation to cover contraceptive services and renders this action moot is speculative and is not sufficient to make plaintiffs' claims non justiciable. *See CSI Aviation Servs., Inc. v. Dep't of Transp.,* 637 F.3d 408, 412 (D.C.Cir.2011) (rejecting an agency's mootness argument based on a promised rulemaking where the existing agency action already "imposed an immediate and significant burden").

The Court appreciates that other courts have held otherwise. Nevertheless, I conclude that those courts overestimate the significance of the ANPRM and underestimate the finality of the Coverage Mandate. For example, the *Nashville* court concluded that "the preventive services regulations, in their current form, will not be enforced against Plaintiffs," 2012 WL 5879796, at *3, and the *Legatus* court remarked that "Legatus asks the court to enjoin the Government from enforcing a rule that is not yet finalized[.]" 901 F.Supp.2d at 989, 2012 WL 5359630, at *5. I do not see the basis for such holdings. This case has been pending for six months. The earliest case challenging the Coverage Mandate was commenced over a year ago. The ANPRM was announced nearly ten months ago and entered in the Federal Register over eight months ago. In that time, the Departments have had ample opportunity to enact a meaningful change to the Coverage Mandate.[10] The fact that they have not further suggests the likelihood of injuries to plaintiffs.

The Coverage Mandate is a final rule, *see* 77 Fed.Reg. 8,730 (adopting the Interim Final rules "as a final rule without change"), and the ANPRM has not made the Coverage Mandate any less binding on plaintiffs. Therefore, this is not a case where an enforcement action is only "remotely possible" or plaintiffs' concerns are "imaginary or speculative." *See Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298–99, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979).

Even if plaintiffs' future harms were not sufficiently imminent to be considered injuries in fact, the Court would find that plaintiffs have standing because the Coverage Mandate is causing plaintiffs to suffer present harm. First, the impending effectiveness of future regulations can cause present effects that are sufficient to create standing. For example, in cases where plaintiffs challenged the Individual Mandate of the ACA prior to its effective date, courts focused on "the immediate economic

---

10. Indeed, on August 15, 2012, HHS reissued a bulletin originally issued on February 10, 2012 to clarify certain substantive issues concerning the temporary enforcement safe harbor.

pressure" on plaintiffs "as a direct result of the [I]ndividual [M]andate." *Goudy–Bachman v. Dep't of Health & Human Servs.*, 764 F.Supp.2d 684, 691 (M.D.Pa. 2011). Courts- found that plaintiffs had standing because they were already incurring the opportunity costs of having to purchase health insurance—such as not purchasing a new car, reducing spending, or diverting money from other business goals. *Id.* at 691–92. *See also Butler v. Obama*, 814 F.Supp.2d 230, 236–37 (E.D.N.Y.2011) (collecting cases where standing was found based on plaintiffs' allegations of "some current financial injury based upon their preparation for the implementation of the [I]ndividual [M]andate").

Although, as defendants point out, there was no question that the Individual Mandate would be put into effect, numerous cases have also recognized that uncertain future harms can have present effects that are sufficient for standing purposes. For example, in *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490 (7th Cir.2005), plaintiff, a Native American tribe, alleged that it was placed at a disadvantage in seeking permission to operate a casino because of an arrangement between Wisconsin and another tribe. Although defendants argued that plaintiff could not show an injury in fact based on this disadvantage because there was "no guarantee" that plaintiff would receive the administrative approval that was a necessary precondition of its application, the Seventh Circuit concluded that plaintiff had standing to bring the suit. *Id.* at 495, 498. It reasoned that "the chance that the Secretary might deny [plaintiff's] application does not render plaintiff's injury speculative" because "the present impact of a future, though uncer-

tain harm may establish injury for standing purposes." *Id.* at 498. Specifically, the court noted that plaintiff needed to attract investors years in advance in order to finance its casino and the disputed compact impaired its ability to do so and increased its capital costs. *Id.* at 499.

Likewise, in *Clinton v. City of New York*, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998), the Supreme Court found Article III's standing requirements satisfied where allegedly speculative harms caused plaintiffs present injury. One item at issue was a contingent liability faced by New York City that had been revived through the President's use of a line item veto. The Supreme Court held that New York had standing to challenge the line item veto, even though a pending administrative action could waive the contingent liability, because "[t]he revival of a substantial contingent liability immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor." *Id.* at 431, 118 S.Ct. at 2099.

Plaintiffs here have established similar present harms stemming from the future operation of the Coverage Mandate. These harms range from budgeting and administrative costs incurred in analyzing how to update their health plans once the Coverage Mandate becomes effective to the diversion of funds away from ministries, such as healthcare, in order to prepare for possible fines for failure to comply with the Coverage Mandate. Moreover, CHSLI faces the unique harm of increased costs (and foregone cost savings) related to providing health care coverage to its nurses because the NYSNA is no longer willing to provide coverage that does not include contraceptives in light of the Coverage Mandate.[11]

11. Although defendants have not raised this argument, the involvement of a third party, NYSNA, suggests that CHSLI's injury may not be fairly traceable to the Coverage Mandate. The *Nashville* court was receptive to such an argument. There, certain plaintiffs

In response, defendants rely on the ANPRM. They argue that "it is hard to fathom how plaintiffs can reasonably incur costs planning for the effects of a not-yet promulgated regulation, particularly one that is intended to accommodate concerns of the very type that plaintiff has raised." In other words, plaintiffs' preparation costs and resource diversions are unnecessary, according to defendants, because the ANPRM makes it doubtful that the Coverage Mandate will apply to them. In support, defendants cite *McConnell* to argue that any injury plaintiffs suffer as a result of their preparation for the Coverage Mandate going into effect is a result of their own choice and, thus, not fairly traceable to defendants' conduct. Plaintiffs in *McConnell* alleged that a law raising hard-money campaign contribution limits placed them at a fundraising disadvantage because they did not wish to solicit large contributions for political reasons. The Supreme Court held that this disadvantage did not constitute "an injury in fact that is 'fairly traceable'" to the challenged law because plaintiffs' "alleged inability to compete stems not from the operation of [the statute], but from their own personal 'wish' not to solicit or accept large contributions, *i.e.*, their personal choice." 540 U.S. at 228, 124 S.Ct. at 709.

The injuries that plaintiffs are suffering because of the Coverage Mandate are different. In *McConnell*, it was plaintiffs'

personal preferences, rather than the statute, that placed them at a disadvantage. Here, however, the operation of Coverage Mandate has itself changed insurance requirements. Since each plaintiff employs numerous people, the practical realities of administering their employees' health care coverage require plaintiffs to undertake the preparations about which they now complain. Even though the ANPRM makes it uncertain that the Coverage Mandate will ultimately apply to them, plaintiffs persuasively argue that if they assume that the Coverage Mandate will be modified and guess wrong, given the timelines at issue, they will be unprepared for the onerous fines or other eventualities that occur when the Coverage Mandate goes into effect.

Defendants' arguments to the contrary ring hollow because defendants themselves acknowledged that employers will have to engage in advance preparation for the implementation of the ACA's provisions. In fact, defendants highlighted the preparations that employers will need to make as a reason for issuing the Interim Final Rules long before their effective date. As the Interim Final Rules themselves explain:

> [T]he requirements in these interim final regulations require significant lead time to implement. These interim final regulations require plans and issuers to pro-

---

alleged current harm because their insurance carrier presently required the provision of contraceptive services notwithstanding the fact that plaintiffs fell within the safe harbor. The court concluded that this harm was not "fairly traceable" to the Coverage Mandate because it was a result of the insurer's refusal to honor the safe harbor. 2012 WL 5879796, at *4. *Nashville* is distinguishable from the facts here. Unlike the insurer in *Nashville*, NYSNA is not refusing to honor a portion of the Department's regulatory scheme. Instead, it is abiding by that scheme in refusing to provide insurance without contraceptive

coverage. NYSNA's decision to abide by the law is what is causing CHSLI to face increased cost. The law is clear that, in the standing context, "[a] causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir.2011) (internal quotation marks and alterations omitted). It is entirely plausible that a the harm caused by a third party's refusal to provide a cost-saving service it previously offered in order to comply with a new regulation is fairly traceable to that regulation.

vide coverage for preventative services listed in certain recommendations and guidelines without imposing any cost-sharing requirements.... With respect to the changes that would be required to be made under interim final regulations, group health plans and health insurance issuers subject to these provisions have to be able to take these changes into account in establishing their premiums, and in making other changes to the designs of plan or policy benefits, and these premiums and plan or policy changes would have to receive necessary approvals in advance of the plan or policy year in question.... *Accordingly, in order to allow plans and health insurance coverage to be designed and implemented on a timely basis, regulations must be published and available to the public well in advance of the effective date of the requirements of the [ACA].* 75 Fed.Reg. 41,730 (emphasis added). Defendants cannot recognize employers' need for advance preparation as a result of their actions in one context, but disclaim responsibility for those preparations in another context.

Again, the Court recognizes that the other courts to have addressed this issue reached the opposite conclusion. As stated in *Belmont Abbey,* "[c]osts stemming from Plaintiff's desire to prepare for contingencies are not sufficient, however, to constitute hardship ... particularly when the agency's promises and actions suggest the situation Plaintiff fears may not occur." 878 F.Supp.2d at 41. *See also Zubik,* 911 F.Supp.2d at 329, 2012 WL 5932977, at *11 (same); *Nashville,* 2012 WL 5879796, at *5 (same); *Wheaton Coll.,* 887 F.Supp.2d at 112–13 (same); *Nebraska,* 877 F.Supp.2d at 802–03 (same). Fundamentally, however, this Court cannot accept that the present costs incurred by plaintiffs are simply the result of their "desire to prepare for contingencies." Quite frankly, ignoring the speeding train that is coming towards

plaintiffs in the hope that it will stop might well be inconsistent with the fiduciary duties that plaintiffs' directors or officers owe to their members. As explained above, the practical realities of administering health care coverage for large numbers of employees—which defendants' recognize—require plaintiffs to incur these costs in advance of the impending effectiveness of the Coverage Mandate. That is a business reality that any responsible board of directors would have to appreciate.

Moreover, the First Amendment does not require citizens to accept assurances from the government that, if the government later determines it has made a misstep, it will take ameliorative action. There is no, "Trust us, changes are coming" clause in the Constitution. To the contrary, the Bill of Rights itself, and the First Amendment in particular, reflect a degree of skepticism towards governmental self-restraint and self-correction. *See Florida Cannabis Action Network, Inc. v. City of Jacksonville,* 130 F.Supp.2d 1358, 1362 (M.D.Fla.2001) ("The whim, self restraint, or even the well reasoned judgment of a government official cannot serve as the lone safeguard of First Amendment rights."). Considering the extraordinary political passion surrounding the Coverage Mandate from all sides, there is simply no way to predict what, if any, changes to the Coverage Mandate will be made, even if some policymakers favor certain changes.

As far as the contrary authority, plaintiffs in this action have made a more concrete and compelling showing of present injury than plaintiffs in most of the other cases that have addressed defendants' jurisdiction argument. The *Wheaton Coll.* court noted that Wheaton had failed to demonstrate any "specific present objective harm[.]" 887 F.Supp.2d at 111. The *Wheaton Coll.* complaint only alleged that

Wheaton had to devote resources "to determining how to respond to the [Coverage] Mandate" and was burdened in its employee recruitment efforts because of uncertainty. Defendants argued that these allegations were insufficient to plead standing because they did not demonstrate why, in light of the ANPRM, Wheaton was expending its resources in this way. In *Belmont Abbey*, plaintiff also only claimed being disadvantaged in employee recruitment and having to devote resources to determining how to respond to the Mandate. The harms at issue in *Legatus* only included being disadvantaged in employee recruitment and the need to prepare for plan changes months in advance of the implementation of the implementation of the Coverage Mandate. Plaintiff in *Legatus* did not, however, claim that the operation of the Coverage Mandate increased its plan preparation costs. Plaintiffs in *Nashville* only claimed that changes in their plans as a result of the Coverage Mandate would require more lead time to implement than typical changes, that they were being forced to "consider" limiting public services, and that they were placed at a disadvantage in employee recruitment. Lastly, plaintiffs in *Zubik* described some concrete present harms, including losing a specific applicant for a management position and having to indemnify a coverage providers, but most of the harms at issue merely involved fear of future injury, such as the loss of government and charitable funding.[12]

By contrast, plaintiffs here have demonstrated how the enormous changes to their plans required by the Coverage Mandate currently exacerbate their preparation costs. They have also demonstrated that the imminent operation of the Coverage Mandate has already caused them to divert funds from their ministries and, in the case of CHSLI, face increased health care costs for their employees.

Finally, by holding that the harms plaintiffs are currently incurring constitute injuries in fact, the Court has not thrown open the floodgates to speculative, pre-enforcement suits as defendants suggest. Although defendants are correct that "[e]very organization needs to plan for the future, sometimes even for events that are unlikely to occur[,]" that truism does not imply that "an organization would have standing to challenge a future event that has one a one-percent chance of happening." The law remains that a threatened harm must be certainly impending to give rise to an injury in fact and this Court's holding does not undermine this limitation. The Court's holding—that preparatory costs in advance of the effective date of a binding regulation, which an agency acknowledges are necessary, can constitute certainly impending harms—is narrow and hardly seems likely to cause the courts to

---

12. In addition, some of the other cases addressing the Departments' jurisdiction argument have involved facial challenges to subject matter jurisdiction, rather than factual ones. Both the *Nebraska*, 877 F.Supp.2d at 790–91, and the *Zubik*, 911 F.Supp.2d at 322–23, 2012 WL 5932977, at \*5, courts construed the Departments' motions to dismiss as facial challenges, although the *Zubik* court, nonetheless, commented on matters set forth in plaintiffs' affidavits. The *Nashville* court appeared to conduct a facial inquiry, 2012 WL 5879796, at \*3, and, accordingly, it centered its analysis on the allegations in the complaint. *See also Wheaton Coll.*, 887 F.Supp.2d 102 (analyzing plaintiff's allegations where plaintiff had not put additional facts before the court). The *Belmont Abbey* court, on the other hand, recognized that it was allowed to consider materials extrinsic to the complaint, 878 F.Supp.2d at 32–33, but its analysis still focused largely on the sufficiency of plaintiff's allegations. *See also Legatus*, 901 F.Supp.2d 980, 2012 WL 5359630 (analyzing facts alleged in the complaint and set forth in supporting papers).

be inundated with actions based on speculative harms.

## III. Ripeness

■ Defendants' alternative ground for dismissal is that even if plaintiffs have standing to challenge the Coverage Mandate, their claims are not ripe for judicial review. "Ripeness is both a constitutional and a prudential doctrine." *Friends of Hamilton Grange v. Salazar,* No. 08 Civ. 5220, 2009 WL 650262, at *17 (S.D.N.Y. Mar. 12, 2009). Although it is not entirely clear from their briefs, it appears that defendants' motion is based on prudential ripeness doctrine as they contend that the Court "should" dismiss this case as unripe, not that the Court must dismiss the case. *See Simmonds v. INS,* 326 F.3d 351, 357 (2d Cir.2003) ("Constitutional ripeness is a doctrine that, like standing, is a limitation on the power of the judiciary.").

■ Prudential ripeness has to do with when a court should entertain a lawsuit, not whether it may entertain the suit. The prudential ripeness inquiry focuses on "whether the alleged policy at this stage is sufficiently definite and clear to permit sound review by this Court[.]" *New York Civil Liberties Union v. Grandeau,* 528 F.3d 122, 131 (2d Cir.2008). There are two prongs to this inquiry, "requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).[13]

■ Ripeness analysis is similar to standing analysis. *See Warth,* 422 U.S. at 499 n. 10, 95 S.Ct. at 2205 n. 10 ("The standing question ... bears close affinity to questions of ripeness—whether the

harm asserted has matured sufficiently to warrant judicial intervention"). Like standing, ripeness doctrine "prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *Ross,* 524 F.3d at 226. Where a defendant's "ripeness arguments concern only" the "requirement that the injury be imminent rather than conjectural or hypothetical" then "it follows that our analysis of [defendant's] standing challenge applies equally and interchangeably to its ripeness challenge." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.,* 462 F.3d 219, 225–226 (2d Cir.2006), *abrogated on other grounds, Bond v. United States,* —— U.S. ——, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011).

■ Defendants argue that plaintiffs' challenge to the Coverage Mandate is not fit for judicial review because the ANPRM initiated a process to amend the Coverage Mandate and, in the meantime, the temporary enforcement safe harbor protects plaintiffs from any hardship.

### A. *Fitness*

The fitness analysis concerns "whether the issues sought to be adjudicated are contingent on future events or may never occur." *Isaacs v. Bowen,* 865 F.2d 468, 478 (2d Cir.1989). Courts have considered challenges to agency policies unfit for resolution where the challenge was "directed at possibilities and proposals only, not at a concrete plan which has been formally promulgated and brought into operation." *Id.* at 477. Consequently, courts distinguish between "pre-enforcement judicial review of specific regulations promulgated by the agency and judicial review of a nonfinal

---

**13.** Constitutional ripeness is evaluated using the same two-part analysis. *Grandeau,* 528 F.3d at 132 n. 9.

proposed policy." *Grandeau*, 528 F.3d at 132 (internal quotation marks omitted).

■ Pre-enforcement challenges to a regulation may be fit for resolution when the regulation was "promulgated in a formal manner after announcement in the Federal Register" and is "quite clearly definitive[.]" *Abbott Labs.*, 387 U.S. at 151, 87 S.Ct. at 1517. On the other hand, generally "[a] claim is not ripe where the possibility that further consideration will actually occur before [implementation] is not theoretical but real." *Full Value Advisors v. S.E.C.*, 633 F.3d 1101, 1107 (D.C.Cir.2011) (second alteration in original, internal quotation marks omitted).

For the reasons already discussed, the Court is of the opinion that the Coverage Mandate is "quite clearly definitive." It is not a non-final proposed policy; it is a final rule. *See Zubik*, 911 F.Supp.2d at 325, 2012 WL 5932977, at *8 ("There is no doubt that the regulations challenged by Plaintiffs are 'clearly definitive' by virtue of having been formally promulgated.") And although the Court will assume that the consideration that the Departments will conduct pursuant to the ANPRM is real, not merely theoretical, there is no way to tell where that will go; "the ANPRM is not a "concrete" plan." It is, in fact, only "directed at possibilities." The Court realizes that declining review of agency actions that are being reconsidered by the agency affords "time for the challenging party to convince the agency to alter a tentative position" and "provides the agency an opportunity to correct its own mistakes and apply its expertise[.]" *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C.Cir.2012) (internal quotation marks omitted). But the Coverage Mandate is not a "tentative" agency position.

Defendants cite *Am. Petroleum Inst.* for the proposition that even a final agency regulation may be considered a tentative position unfit for judicial review when the agency has undertaken to amend the regulation. Defendants' (and the other courts') reliance on *Am. Petroleum Inst.* is misplaced. The amendments at issue in *Am. Petroleum Inst.* are significantly different from the ANPRM. While the original regulation provided that "spent refinery catalysts" were not included in a class of deregulated substances, the amendments proposed both the inclusion of the catalysts and the elimination of the entire deregulated class. In other words, the amendment constituted "a complete reversal of course on EPA's part that, if adopted, would necessitate substantively different legal analysis." *Id.* at 388. While the EPA's position could fairly be considered tentative in light of its substantive policy reversal, the ANPRM does not announce any similar reversal of policy. As defendants admit, the ANPRM "does not preordain what amendments to [the Coverage Mandate] defendants will ultimately promulgate[.]" Indeed, it is still possible that the Coverage Mandate as it is currently structured will become effective at the expiration of the safe harbor.

Therefore, the Court concludes that plaintiffs' challenge to the Coverage Mandate is fit for judicial review.

### B. *Hardship*

■ In assessing the hardship of withholding judicial consideration, courts "ask whether the challenged action creates a direct and immediate dilemma for the parties. The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Grandeau*, 528 F.3d at 134 (internal citations and quotation marks omitted). Rather, hardship is present "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to

noncompliance[.]" *Abbott Labs.*, 387 U.S. at 153, 87 S.Ct. at 1518.

For the reasons discussed in the standing context, the Court concludes that the Coverage Mandate is causing plaintiffs at least some "some present detriment" and that plaintiffs' preparations in order to avoid noncompliance (or budget for the penalties) are justified in light of the practical realities of the Coverage Mandate. Thus plaintiffs have adequately demonstrated hardship from withholding judicial review. Importantly, even if the Court were to find that the Coverage Mandate was not fit for review, plaintiffs' hardship would "outweigh[ ] the competing institutional interests in deferring review." *See Eagle–Picher Indus., Inc. v. EPA*, 759 F.2d 905, 915 (D.C.Cir.1985). *See also Connecticut v. Duncan*, 612 F.3d 107, 115 (2d Cir.2010) (noting that hardship "alone can, if sufficiently weighty, render a claim ripe").

For this reason, defendants' (and the other courts') reliance on cases where hardship was not demonstrated is unavailing. For example, in *Full Value Advisors,* although the challenged disclosure regulations were operative, plaintiff's "allegedly proprietary information ha[d] not been disclosed publicly" and, thus, plaintiff "had not yet suffered any hardship as a result of the ... disclosure requirements." 633 F.3d at 1107. Likewise, in *Tex. Indep. Producers & Royalty Owners Ass'n v. EPA*, 413 F.3d 479 (5th Cir.2005), the EPA deferred the effective date of a rule and, during the deferral period, it intended to consider issues raised by plaintiffs. Although the court found petitioners' challenge to the rule unripe in part because the court did not want to "prematurely cut off the EPA's interpretative process[,]" the court also concluded that petitioners had not satisfied the hardship element of the ripeness test where the rule's effectiveness was delayed and the petitioners admitted

that their industry—oil and gas exploration and production—"is unable to plan far in advance." *Id.* at 483. By contrast, the practical realities of administering employee health coverage require planning far in advance, as defendants admit.

The Court is mindful that litigating the merits of plaintiffs' challenge to the Coverage Mandate raises extremely important questions about the extent to which laws of general applicability must accommodate religious beliefs and that a crucial function of prudential ripeness doctrine is to avoid "premature examination of ... constitutional issues that time may make easier or less controversial." *See Duncan,* 612 F.3d at 114. At the same time, the touchstone of prudential ripeness is that "the case will be *better* decided later and [ ] the parties will not have constitutional rights undermined by the delay." *Simmonds,* 326 F.3d at 357. Because the Court finds that the Coverage Mandate is sufficiently definite, notwithstanding the ANPRM, and the operation of the Coverage Mandate is imposing costs on plaintiffs that they claim a constitutional right to be free from, this is not a case the will be "better decided later." The risk here of a *fait accompli* that would cause plaintiffs either financial or First Amendment injury is simply too high.

The Court has no desire to interfere with or become entangled in the Departments' policy debates. The Departments are, of course, free to amend the Coverage Mandate at any time and the Court takes no position on whether any amendment is necessary or advisable. But the Coverage Mandate has caused and will continue to cause plaintiffs harm so long as it remains in place. The Departments' possible decision to amend their policies does not abrogate plaintiffs' right to seek relief for their injuries.

## CONCLUSION

Defendants' motion to dismiss for lack of jurisdiction [16] is granted in part and denied in part. The claims of the Diocese and Catholic Charities are dismissed for lack of standing. Defendants' motion is otherwise denied.

**SO ORDERED.**